IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WAYNE MASON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 10-411-CG-B |
| | ) | |
| MITCHELL'S CONTRACTING | ) | |
| SERVICE, LLC, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

## ORDER

This matter is before the court on defendant's motion for summary judgment. (Doc. 37). The parties have filed briefs and evidentiary materials in support of their respective positions (Docs. 38, 41, 47, 48, 50, 55, 58, and 61), and the motion is now ripe for resolution. After careful consideration of the foregoing, the court concludes that the motion is due to be **GRANTED in part** and **DENIED in part**.

## I. FACTUAL BACKGROUND

The defendant, Mitchell Contracting Service, LLC ("MCS"), is a small civil contracting company located in Catherine, Alabama, and is engaged primarily in dirt, paving, and septic work. (Doc. 41-2, p. 2). MCS is owned by Primm Mitchell ("Mitchell") and employs approximately eight to ten people. Id.

1

There are several categories of employees at MCS: (1) truck drivers, (2) laborers, and (3) equipment operators, as well as a supervisory superintendent.  Id., (Doc. 47, p. 3).  Mitchell makes all human resource decisions at MCS, including each employee's rate of pay, which he bases on each employee's experience, performance, attendance, seniority, attitude, and initiative.  Id.

The plaintiff, Wayne Mason ("Mason"), is an African American male from Safford, Alabama.  (Doc. 1, p. 2).  MCS hired Mason as a dump truck driver in approximately June 2004.  (Doc. 41-2, p. 4).

Mason paints a dismal picture of the atmosphere at MCS.  Specifically, Mason asserts that Mitchell routinely addressed African American employees as "nigger,"  "motherfuckers," and "boy," and used additional, unspecified profanity to "speak down" to African American employees.  (Doc. 1, pp. 4-5).  Mason further claims that Mitchell stated that he did not want African Americans working for him, but that he did not have a choice in the matter, and that he also once stated that he purchased a two million dollar insurance policy because he knew that he would eventually "get caught" calling African Americans "niggers" and "bastards." Id.  Mason also relates an incident that he claims took place in approximately 2006, when he took the day off from work in observance of the national holiday marking Martin Luther King, Jr., Day.  Id. at p. 4.  Upon returning to work the following day, Mason alleges that Mitchell told him, "they should have killed four more niggers, and you would have had the whole week off."  Id.

More generally, Mason alleges that African American employees were given the least desirable jobs at MCS and that they were given the oldest, most deteriorated trucks to drive.  Id. at 5.  Mason also claims that when business at MCS was slow and there was not enough work for all employees, he and other African American truck drivers were always the first employees to be sent home while white employees were allowed to continue working.  Id.  Furthermore, Mason alleges that African American employees were paid less than white employees.  Id.

On the evening of Sunday, November 9, 2008, Mason called his supervisor at MCS, Terry Wilkerson ("Wilkerson"), to let him know that he was sick and would not be at work the following day.  (Doc. 38-4, p. 6).  Mason did not call MCS again and did not go to work at all the following week, from Monday, November 10, through Friday, November 14, (Doc. 41-2, p. 4).  Wilkerson did not tell Mason to call when they spoke on Sunday night.  (Doc. 38-4, p. 7), (Doc. 50-3, p. 41).  Wilkerson noted  "sick" on Mason's timesheets for November 10 through the 13.  (Doc. 38-4, p. 7).  The next day, Friday, November 14, started a new week for MCS's bookkeeping, and Wilkerson, not having heard from Mason, wrote "no show" on Mason's timesheet.  (Doc. 38-4, p. 7).

The parties dispute what happened next, and therefore the court views the facts in the light most favorable to the non-moving party, Mason.  The following week, Mason called MCS and spoke to Wilkerson again.  (Doc. 50-3, p. 41).  Mason told Wilkerson that he was still sick and needed to take "a couple" more days off

from work, to which Wilkerson replied that if Mason needed to take more time, then he should go ahead and take the time off.  Id. at p. 44.

Several days after this second conversation between Mason and Wilkerson, Mitchell called Mason and told him to turn in his uniform and company-issued cell phone.  Id. at p. 44.  Mitchell did not explicitly say that Mason was fired, but according to Mason, it was obvious from the tenor of the conversation.  Id. at p. 45. Mason thinks that Mitchell told him the reason for his termination was that Mason was sick and could not work, but also states that he has difficulty remembering the conversation clearly.  (Doc. 38-3, p. 29).  Rather than turn in his uniform and cell phone in person, Mason gave them to fellow MCS employee Jack Moore, who turned them in to MCS.  Id. at 46.

On May 5, 2009, Mason filed a charge of discrimination with the EEOC, alleging that he had been subjected to "racial harassment and racial comments" by Mitchell during his employment at MCS; that he had been treated differently than similarly situated white drivers; and that he was terminated after Mitchell told him to turn in his uniform and cell phone because he was sick and could not work.  (Doc. 48-19, p. 2).


## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  The trial

court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds might differ on the inferences arising from undisputed facts, then [a court] should deny summary judgment." Hinesville Bank v. Pony Exp. Courier Corp., 868 F.2d 1532, 1535 (11th Cir. 1989) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(a), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Co., 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991.  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must set out specific facts showing a genuine issue for trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).  "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation and citation omitted).

## III. LEGAL ANALYSIS

### A.  Judicial Estoppel

Mason filed a Bankruptcy Petition on June 23, 2010.  (Doc. 38-7).  However, he did not disclose his pre-existing EEOC claim as required on either the Petition's Debtor's Schedules ("Schedules") or the Statement of Financial Affairs ("SFA").[1] Likewise, Mason did not amend his Petition to add his discrimination claim until January 28, 2011 – almost seven months after filing suit in this case.  (Doc. 38-9). MCS claims that Mason cannot bring his claim before this court because the doctrine of judicial estoppel prevents him from pursuing a racial discrimination claim in the District court, having sworn to the Bankruptcy court that no claims existed.  (Doc. 41-1, p. 3).

### 1.  Statement of the Law

"Judicial estoppel is an equitable doctrine invoked at a court's discretion." Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002) (citing New Hampshire v. Maine, 532 U.S. 742, 750 (2001).  This doctrine "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  New Hampshire, 532 U.S. at 749 (internal quotations omitted).  Although there are no "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," the U.S. Supreme Court has elucidated several factors which typically inform the decision

---

[1] Mason's EEOC charge was filed on May 5, 2009.  (Doc. 48-19, p. 2).  The EEOC's cause determination was issued on December 3, 2009.  (Doc. 48-14, p. 2).  The EEOC issued a right to sue letter on May 6, 2010.  (Doc. 41-1, p. 4).

whether or not to apply judicial estoppel in a particular case.  Id. at 751.  "First, a party's later position must be 'clearly inconsistent' with its earlier position."  Id. at 750  (string citation omitted).  "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled...'"  Id. (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982).  "[T]hird...is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  Id. at 751

Courts in the Eleventh Circuit consider two additional factors in applying the doctrine of judicial estoppel to a particular case. "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system."  Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002).  However, these two factors are not "inflexible or exhaustive," and therefore the court must give due consideration to all of the circumstances of a particular case when considering the applicability of judicial estoppel. Id. at 1286.

As a general matter, "while privity and/or detrimental reliance are often present in judicial estoppel cases, they are not required." Id. This is because judicial estoppel protects the integrity of the judicial system, and not the litigants. Id.

(quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co. et al., 81 F.3d 355, 362 (3rd Cir. 1996).

### 2. Analysis

The duty to disclose all assets and potential assets to the bankruptcy court is a continuing duty that does not end once the forms are submitted.  Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1274 (11th Cir. 2010) (quoting Burnes, 291 F.3d at 1286).  This duty applies to proceedings under both Chapter 13 and Chapter 7 of the Bankruptcy Code.  Id.  "[A]ny distinction between the types of bankruptcies available is not sufficient enough to affect the applicability of judicial estoppel because the need for complete and honest disclosure exists in all types of bankruptcies."  Id. (quoting DeLeon v. Comcar Industries, Inc., 321 F.3d 1289, 1291 (11th Cir. 2003).

### (i) Statement Submitted Under Oath In a Prior Proceeding

There is ostensibly no debate that Mason's financial disclosure forms were submitted under oath to the bankruptcy court, and Mason has not explicitly claimed otherwise.  (See Doc. 47, p. 39-46).  However, Mason asserts several facts which suggest that he is somehow not responsible for the statements that were submitted to the bankruptcy court in his name, under oath.  (See Doc. 48-2, pp. 2-3).

Specifically, Mason states in his Declaration (Doc. 48-2), that his bankruptcy attorney prepared all of the documents to be filed in his Chapter 13 bankruptcy filing, (Id., p. 2), and that Mason did not personally sign the Petition.  (Id. at 3).  Yet Mason's electronic signature can be found on the Petition on page 3 (Doc. 38-7, p. 4),

9

on the Schedules (Id., p. 33), and on the SFA.  (Id., p. 37).  All three electronic signatures are made under the penalty of perjury, and the latter two declarations affirm that the petitioner *actually read* the preceding documents and attests to their truthfulness and correctness.  Id.

The old Fifth Circuit[2]  cited both the Supreme Court of Louisiana and Professor Wigmore for the proposition that "a party whose admissions have been offered against him may offer any evidence which serves as an explanation for his former assertion of what he now denies to be the fact; and that where the attorney and not the party has signed the pleading it may be shown that the attorney was not authorized to make the allegations contained in the pleadings." Great American Indemnity Co. v. Rose, 242 F.2d 269, 272 (5th Cir. 1957) (citing Coleman v. Jones & Pickett, 131 La. 803 (1912), 4 Wigmore on Evidence, 3rd Ed. 23, 54, §§ 1059, 1066).

Here, though, Mason has not argued nor offered evidence that his bankruptcy counsel signed his name electronically without permission.  And there is nothing in the record to suggest that Mason objected to the Bankruptcy Petition when it was filed, or shortly thereafter.  Mason did not move the amend the Petition until seven months after it was filed -- five months after Mason filed his Complaint in the instant case.  Furthermore, the court notes that Mason's summary judgment brief and attached declaration marks the first time that he claimed not to have signed the Petition.

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding all decisions of the Fifth Circuit that were issued prior to October 1, 1981.

Given Mason's sworn declarations to the bankruptcy court that *he actually read* the statements he now disclaims knowledge of, and given the lack of evidence or argument that Mason's bankruptcy counsel signed his name without permission, it would indeed make a mockery of the judicial system for Mason to now benefit from his assertion that he "never saw" and "did not personally sign" the Petition "that was filed on his behalf." (Doc. 47, p. 41). Accordingly, the court takes the electronic signatures at face value and finds as a matter of undisputed fact that Mason submitted his Petition under oath to the bankruptcy court in his Chapter 13 bankruptcy proceeding, which predates the instant case. Therefore, the matter turns upon the question of intent.

**(ii) Intent**

Judicial estoppel may be applied only in situations involving intentional manipulation of the courts, and not when the litigant's contradictory positions are "the product of inadvertence or mistake." Burnes, 291 F.3d at 1287 (quoting Matter of Cassidy, 892 F.2d 637, 642 (7th Cir. 1990)). In cases where a debtor fails to disclose a claim or potential claim in a bankruptcy proceeding, the court will find the failure inadvertent only when the debtor either (i) lacks knowledge of the undisclosed claim or (ii) has no motive for its concealment. Burnes, 291 F.3d at 1287 (citing In re Coastal Plains, Inc., 179 F.3d 197, 210 (5th Cir. 1999). Otherwise, intent may be inferred. Id.

11

**(a) Knowledge of Claims**

It is undisputed that Mason had knowledge of his claim against MCS when he filed for bankruptcy. This notion is bolstered by the fact that Mason brought his EEOC charge on May 5, 2009 – more than a year before he filed the Petition on June 23, 2010. (Doc. 48-19, p. 2), (Doc. 38-7). Both the EEOC cause determination and the right to sue letter were also issued months before Mason subsequently filed his Petition. (See Docs. 48-14, 41-1, p. 4). It is of no import that Mason did not file a *lawsuit* before filing his Petition, because the EEOC charges constitute "administrative proceedings" and "[o]ther contingent and unliquidated claims" that Mason was required to disclose in his SFA and Schedules. Casanova v. Pre Solutions, Inc., 228 Fed. Appx. 837, 841 (11th Cir. 2007). "The property of bankruptcy estate includes all *potential* causes of action existing at time petitioner files for bankruptcy." Id. (quoting Barger v. City of Cartersville, 348 F.3d 1289, 1293 (11th Cir. 2003).

**(b) Motive for Concealment**

Therefore, the issue of intent depends on whether Mason had a motive to conceal his discrimination claim. Mason claims that he had no motive to conceal his claim because his Chapter 13 debtor's plan provides for 100% payment to creditors, both secured and unsecured. (Doc. 47, p. 43). If Mason will pay all of his creditors 100% of their claims, then, he argues, he was not motivated to conceal his discrimination claim since the inclusion of such an asset would not have increased the amount Mason had to pay. Id. Mason also points out that no creditors were

prejudiced by his failure to include his claim on the Petition, and asserts that "the important fact" is that he ultimately amended the Petition to include the claim against MCS.  Id.

Mason's argument conflicts with Eleventh Circuit precedent, because the doctrine of judicial estoppel protects the integrity of the judicial system, and not the litigants or other parties.  Burnes, 291 F.3d at 1286.  Therefore, full monetary repayment to creditors does not necessarily preclude finding a motive to conceal. Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1276 (11th Cir. 2010).  The "motive" at issue here stems from the possibility of defrauding the courts and "not from any actual fraudulent result," so the fact that no creditors were prejudiced by the nondisclosure does not make the application of judicial estoppel inappropriate.  Id. at 1275.  Furthermore, the fact that Mason applied for Chapter 13 bankruptcy rather than Chapter 7 bankruptcy has no effect on the court's inquiry, because the need for complete and honest disclosure exists in all types of bankruptcies.  DeLeon v. Comcar Industries, Inc., 321 F.3d 1289, 1291 (11th Cir. 2003).

Mason also points to his own Declaration (Doc. 48-2) to show that he had no personal knowledge that his discrimination claim should have been included on the Petition, and claims that he had no intent to manipulate the system because he informed his bankruptcy attorney's office of his claim prior to filing the Petition. (Doc. 47, p. 42).  Citing the Eleventh Circuit's opinion in Ajaka v. BrooksAmerica Mortgage Corp., 453 F.3d 1339 (11th Cir. 2006), Mason argues that, like the plaintiff in that case, his attorney was notified of the claim but did not amend the

Petition, and argues that the court should not impute the bankruptcy attorney's error to Mason.  (Doc. 47, p. 42).

This argument does not forestall the application of judicial estoppel.  Mason had over three months to review his schedules and make amendments before his plan was confirmed on November 11, 2010, but evidently did not take the opportunity to do so.  Mason voluntarily chose his attorney as his representative in the bankruptcy action and, therefore, cannot escape any deficiencies in his case even if they are the result of negligence or omissions on his attorney's part.  Link v. Wabash Railroad Co., 370 U.S. 626, 633 (1962); see also Barger v. City of Cartersville, Ga., 348 F.3d 1289, 1295 ("[I]f an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice."); Cavaliere v. Allstate Ins. Co.,  996 F.2d 1111, 1115 (11th Cir. 1993) ("This Court rejected that argument even though such a result appear[ed] to penalize innocent clients for the forgetfulness of their attorneys.") (citations omitted).

Furthermore, Mason's case is distinguishable from Ajaka, because in that case, unlike here, the defendant filed for a declaratory judgment regarding judicial estoppel before even being served with the complaint.  Ajaka, 453 F.3d at 1343.  The Eleventh Circuit also found that there was "significant evidence… that Ajaka did not intend to conceal" his claim from his creditors. Ajaka, 453 F.3d at 1346.  Mason, by contrast, has offered almost no evidence to bolster his argument other than his own conclusory Declaration. (Doc. 48-2).

14

Mason also argues that the application of judicial estoppel in this case would result in a "windfall" to MCS, and could actually harm innocent creditors, who might be repaid on more favorable terms if Mason's claim in this case were allowed to proceed. Id. at p. 44.  Mason cites Magistrate Judge Greene's Report and Recommendation in Bennett v. Birmingham Board of Education, 2:09-cv-0717-PWG (N.D. Ala. July 9, 2010), to support his argument that judicial estoppel should not be applied.  Id.  But Mason glosses over the fact that Judge Greene ruled in favor of applying judicial estoppel in that case.  Bennett, at p. 14.  In any event, Bennett is of limited utility because the facts are so inapposite – the plaintiff in that case was deceased and his Bankruptcy case had been voluntarily dismissed.  Id.

Mason also seeks to distinguish himself from the plaintiff in Robinson, supra, by arguing that the plaintiff in that case failed to list her husband's worker's compensation claim in addition to her Chapter 13 bankruptcy petition. (Doc. 47, p. 42 at fn. 2).  But the worker's compensation claim in Robinson was a tertiary issue. The Eleventh Circuit focused its discussion of judicial estoppel almost exclusively upon the omission of the plaintiff's discrimination claim, noting that if the claim had settled prior to the discharge of her bankruptcy, then she could have kept the proceeds for herself without their becoming part of the bankruptcy estate.  See Robinson at 1275-76.  The fact that the Eleventh Circuit found a second omitted claim as *additional* evidence of an intent to mislead does not mean that this extra quantum of proof is necessary, over and above a failure to disclose a single claim.

Based on the foregoing, the court finds that the doctrine of judicial estoppel is appropriate in this case, where Mason failed to disclose his racial discrimination claim to the Bankruptcy Court in his Petition of June 23, 2010.  Therefore, Mason is estopped from collecting monetary damages from MCS in the instant action.

### B.  The Case on the Merits

The doctrine of judicial estoppel applies only to Mason's claims for monetary damages, and does not bar his claims for declaratory and injunctive relief. See Burnes, 291 F.3d at 1289;  Casanova v. Pre Solutions, Inc., 228 Fed.Appx. 837, 841 (11th Cir. 2007).  Therefore, the court turns to Mason's racial discrimination claim on the merits.

### 1.  Harassment and Hostile Work Environment

### (i)    Preliminary Matters and Mason's Motion for the Court to Consider Difficulty of Securing Testimony of Relevant Witnesses for Response in Opposition to MCS's Motion for Summary Judgment

As a preliminary matter, Mason asserts that MCS, in its summary judgment brief, did not contest second and third elements of Mason's hostile work environment claim: i.e., that Mason was subjected to unwelcome harassment, and that the harassment was based on Mason's protected status as an African American.  (Doc. 47, p. 46, fn. 5)  However, even a cursory reading of MCS's summary judgment brief shows this to be untrue.  MCS argued on page 8 of its brief that Mason's deposition testimony "establishes that *he was not subject to any harassment while working at MCS*," and that Mason "could not point to one incident where Mitchell or anyone at MCS personally harassed him *on the basis of*

*his race*." (Doc. 41-1, p. 8) (emphasis added).  Accordingly, the court reviews these elements of Mason's hostile work environment claims as contested by MCS.

As a second preliminary matter, Mason argues that the court may consider the EEOC cause determination in ruling on MCS's summary judgment motion,  and cites <u>Mendiola v. Vision Hospitality</u>, 588 F.Supp.2d 1295, 1305 (M.D. Ala. 2008), for the proposition that a cause finding by the EEOC can be a reason to allow a case to continue to trial.  (Doc. 47, p. 46).  MCS argues the opposite, pointing out that the Eleventh Circuit "has eschewed a per se rule of admissibility of …probable cause determinations *at trial* in recognition of the varying quality of such determinations." [emphasis added] <u>Mendiola</u> at 1305 (<u>citing</u> <u>Barfield v. Orange County</u>, 911 F.2d 644, 650 (11th Cir. 1990).

The Eleventh Circuit's reluctance to establish a per se rule of admissibility for EEOC reports and determinations, discussed in passing in <u>Mendiola</u>, pertained to bench and jury trials, rather than motions for summary judgment.  <u>Barfield</u>, 911 F.2d at 649.  Thus, Mason is correct that <u>Mendiola</u> can reasonably be read to permit an EEOC cause finding to be a basis for allowing a case to continue to trial. <u>Mendiola</u> at 1305.  However, the court is by no means required to admit, to defer to, or make reference to an EEOC report, and can refuse to do so if the report "contains legal conclusions in addition to its factual content, or if it presents issues of trustworthiness." <u>Young v. Fedex Exp.</u>, 2011 WL 2555825, *2 (11th Cir. 2011) (quotations omitted).  Furthermore, <u>Young</u> makes clear that the "probative force [of

EEOC reports and determinations] in individual cases varies considerably and is left to the determination of the trial court." Id.

As a third preliminary matter, on May 24, 2011, this court held that "if a party against whom a motion for summary judgment is pending is unable to secure affidavits to oppose the motion, that party may file a motion fully explaining why such affidavits are unavailable and may request the court to consider any difficulty in opposing the motion." (Doc. 42, p. 4.)  Subsequently, Mason filed a motion for the court to consider difficulty of securing testimony of relevant witnesses for response in opposition to defendant's motion for summary judgment ("Doc. 55"), in which Mason claims that one of his witnesses, former MCS employee Brad Dunn, failed to attend his deposition on April 15, 2011, despite having been served with a subpoena.  (Doc. 55, p. 2).  Mr. Dunn did not communicate his reason for failing to attend to Mason's attorney, nor has counsel been able to reach Dunn.  Id.  In lieu of Dunn's deposition testimony,  Mason submitted the notes from an unsworn interview that the EEOC conducted with Dunn on October 5, 2009, in which Dunn stated that he heard Mitchell routinely use the word "niggar" [sic] and "motherfucker" when speaking to African Americans.  (Doc. 55-1, p. 2).

Additionally, Mason claims that another former MCS employee, Jack Moore, agreed to give a sworn declaration that he heard Rusty Mitchell state that he thought "Martin Luther King should have been killed a long time ago." (Doc. 55-3, p. 2).  Tragically, Moore was killed in a traffic accident in June 2011, before he was able to sign his statement.  (Doc. 55, p. 2).  Mason has submitted Moore's unsigned

declaration to the court, arguing that the court should accord it probative weight. (Doc. 55, p. 2).

MCS asserts that the EEOC notes from Dunn's unsworn telephone interview are unreliable and inadmissible as hearsay, pursuant to Fed.R.Civ.P. 56(c)(2). [3] (Doc. 61, p. 1). MCS also points out that in Patterson v. County of Oneida, N.Y., 375 F.3d 206 (2nd Cir. 2004), the Second Circuit ruled that the *sworn* testimony of a non-party witness from a previous hearing was hearsay, and therefore not admissible for summary judgment purposes. If sworn testimony is not admissible, argues MCS, then certainly unsworn testimony is also inadmissible.

Taken in isolation, Dunn's out-of-court statements are inadmissible hearsay because they are out-of-court statements offered for the truth of the matter asserted (i.e., that Mitchell frequently used racial epithets at MCS). (Doc. 55-1, p. 2). However, because Dunn's out-of-court statements were part of the broader EEOC file kept pursuant to Mason's charge of discrimination, those statements are subject to the hearsay exception for public records and reports in Fed.R.Evid. 803(8). (See Young, 2011 WL 2555825 at *2, supra). As stated above, the court has wide discretion in determining the probative force of EEOC reports and determinations at summary judgment. Id. The fact that the Dunn interview was unsworn and contains hearsay shall inform how much weight the court accords. Similarly, the

---

[3] MCS actually cited Fed.R.Civ.P. 56(e), but the court infers that it intended to cite Rule 56(c)(2).

court will consider Mr. Moore's declaration, although the fact that it is unsigned connotes its relative weight.

**(ii) Statement of the Law**

"A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  A plaintiff must show that (1) he belongs to a protected group, (2) he has been subject to unwelcome harassment, (3) the harassment was based on a protected characteristic of the employee, such as race or national origin, (4) the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (5) the plaintiff's employer is responsible for such an environment, either directly or vicariously.  Miller, 277 F.3d at 1275.

In order to determine whether harassment meets the "severe and pervasive" requirement, the court must consider an additional four factors in order to evaluate the objective severity of the harassment, including: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance. Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).  The employee must establish not only

that he subjectively perceived the environment as hostile, but that a reasonable person would perceive the environment to be hostile and abusive.  <u>Barrow v. Georgia Pacific, Inc.</u>, 144 Fed. Appx. 54, 56 (11th Cir. 2005).

Furthermore, "[t]his is not, and by its nature cannot be, a mathematically precise test." <u>Harris</u>, 510 U.S. at 22.  Whether a work environment is hostile can be determined only by looking at all the circumstances. <u>Id.</u> at 23.

**(iii) Mason's Hostile Work Environment Claim**

Mason claims that he was subjected to racially hostile work environment during his employment at MCS.  (Doc. 1, p. 4).  Specifically, Mason asserts that, in approximately 2006, Mason took the day off from work in observance of the national holiday marking Martin Luther King, Jr., Day.  <u>Id.</u>  Upon returning to work the following day, Mason alleges that Mitchell told him, "they should have killed four more niggers, and you would have had the whole week off." <u>Id.</u>

More generally, Mason alleges that Mitchell routinely addressed African American employees as "nigger." <u>Id.</u>  Mason also alleges that Mitchell called him and other African American employees "motherfuckers," addressed them as "boy," and used additional, unspecified profanity to "speak down" to African American employees. <u>Id.</u> at p. 5.  Mason further claims that Mitchell stated that he did not want African Americans working for him, but that he did not have a choice in the matter, and that he also once stated that he purchased a two million dollar insurance policy because he knew that he would eventually "get caught" calling African Americans "niggers" and "bastards." <u>Id.</u> at p. 4.

21

The court addresses each allegation in turn.

**(a) Allegation that Mitchell Addressed Plaintiff as "Nigger"**

Mason's allegation that Mitchell addressed him and other African American employees as "nigger" is severely undercut by Mason's own deposition testimony, in which he admits that Mitchell never said this word to his face. (Doc. 38-3, p. 12). Mason testified that he overheard Mitchell utter the word "nigger" once while Mitchell was talking on the telephone, but admits that Mitchell's back was turned and admits that he does not believe that Mitchell even knew that he was in the room. Id. If Mitchell did not address Mason or other African American employees by this abusive term, then Mason cannot claim to have "subjectively perceived" a hostile environment at MCS with regard to this particular allegation. Furthermore, although it qualifies as an offensive utterance, the fact that Mitchell said the word "nigger" on one occasion does not tend to prove that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [Mason's] employment and create an abusive working environment. " Barrow v. Georgia Pacific Corporation, 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (quoting Harris, 510 U.S. at 21) (plaintiffs failed to establish a hostile working environment where one of the plaintiffs was called "nigger" three times in one year). Accordingly, with respect to this allegation, Mason has failed to establish a prima facie case of a hostile work environment.

**(b) Allegation that Mitchell Addressed Plaintiff as "Boy"**

Mason also alleges that Mitchell addressed him as "boy," and testifies, without elaboration, that this occurred "lots of times."  (Doc. 38-3, p. 19).  Mason further alleges that Mitchell called an African American former employee, Jack Moore, "boy" and that this occurred "all the time."  Id.  MCS points to the testimony of Andrew Cunningham and Tracy Pettway, two African American MCS employees. Cunningham testified that he has never heard Mitchell utter a racial slur (Doc. 38-5, p. 13).  Pettway testified that he heard Mitchell say "boy" in reference to an African American on one single occasion.  (Doc. 38-6, p. 4).

The Supreme Court has held that the word "boy" may be probative of discriminatory bias without the use of modifiers, "[a]lthough it is true the disputed word will not always be evidence of racial animus."  Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006).  A number of factors determine whether the word "boy" is evidence of discrimination or harassment, including the "context, inflection, tone of voice, local custom, and historical usage."  Id.

In McCann v. Tillman, 526 F.3d 1370 (11th Cir. 2008), the Eleventh Circuit found that a black employee's allegations that a white supervisor called her "girl" and two male black employees "boys" on one occasion, and that another coworker referred to a former black employee as a "nigger bitch" did not amount to severe or pervasive harassment.  Id. at 1378-79.  The court stated that, "[a]lthough offensive, such instances of racially derogatory language alone, extending over a period of more than two years, [were] too sporadic and isolated to establish that her

employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment." Id. at 1379.

By contrast, in Miller v. Kenworth of Dothan, 277 F.3d 1269, 1276 (11th Cir. 2002), the Eleventh Circuit found that the plaintiff had established sufficient evidence that the alleged harassment was frequent because, "[plaintiff] *and others* testified that [supervisor's] name-calling permeated the Dothan facility -- he hurled the ethnic slurs at Miller three to four times a day.  Miller's duties required him to go into the service area and interact with [the supervisor] on a daily basis, which means he was unavoidably exposed to the harassing comments throughout the approximately one month period the two men were both employed at Kenworth." [emphasis added].

The court finds that Mason has made an evidentiary showing more akin to that in McCann (where a grant of summary judgment was affirmed) than that in Miller (where a denial of summary judgment was affirmed).  While Mason did testify that Mitchell called him "boy" to his face "a lot of times,"  (Doc. 38-3, p. 19), this is too vague and indefinite to establish objective severity and does not establish that Mitchell's alleged conduct was anything more than sporadic or isolated.  See Alexander v. Opelika City Schools, 352 Fed. Appx. 390, 393 (11th Cir. 2009) (Court held that, where employee could only recall eight specific instances over the course of two years where he was called "boy," purported harassment was not sufficiently severe or pervasive so as to alter the terms and conditions of employment).  Mason's testimony certainly is not as specific or detailed as the plaintiff's showing in Miller,

where the testimony of multiple employees established that the plaintiff was subjected to racial slurs several times a day, every day.  Miller at 1276.  Furthermore, Mason did not testify and did not offer other evidence that Mitchell's alleged conduct impaired his job performance, was physically threatening, or was humiliating.

Mason also argues that Mitchell's alleged comments to Jack Moore should be considered as part of a hostile working environment despite the fact that the comments were not directed at Mason himself.  (Doc. 47, p. 47).  However, Moore's unsigned Declaration, which Mason seeks to have entered into the record, (Doc. 55-1, p. 2), makes no mention of Mitchell ever calling him "boy," or any other racially derogatory term.  Id.

Nevertheless, Mason cites Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 810 (11th Cir. 2010) for support.  But the facts at issue in Reeves are distinguishable from the facts here, because in Reeves, the plaintiff provided extensive, specific testimony to identify "a substantial corpus of gender-derogatory language." Id. at 804.  The plaintiff in Reeves also identified specific incidents of offensive conduct, including the display of pornographic images on office computers, lurid discussions of the body parts of other women in the office, and regular singing of songs about gender-derogatory topics. Id. at 804-806.  By contrast, Mason's allegations that Mitchell addressed Moore as "boy" consists of a single offensive utterance, repeated with unspecified frequency.  While offensive, if true, this nevertheless does not rise to the level of harassment in Reeves, where the plaintiff's

workplace was permeated with daily instances of vulgar, offensive language, pornographic imagery, and sexual degradation to an extent not alleged by Mason in this case (albeit with respect to race, not gender).  Additionally, the plaintiff in Reeves testified at length about her efforts to report the harassment to her superiors, which the Eleventh Circuit found to be a basis upon which a jury could infer the employer's intent to discriminate.  Id. at 811.  Here, Mason testified that he did not complain to Mitchell or anyone else about Mitchell's alleged comments. (Doc. 38-3, p. 19).

Thus, the court finds that Mason has not established a prima facie case of a hostile work environment with regard to the allegation that Mitchell addressed Mason and Moore as "boy."

**(c)  Allegation that Mitchell Addressed Plaintiff as "Motherfucker"**

Mason also alleges that Mitchell addressed him and other African American employees at MCS as "motherfucker."  (Doc. 1, p. 4).  This allegation cannot support a claim for a hostile work environment because Mason has not shown that there was any racial element to Mitchell's use of this phrase.  Mason testified that he only heard Mitchell use this term on two occasions, both on the same day.  (Doc. 38-3, pp. 14-16).  As to the first instance, Mason stated that he and other employees were laying asphalt when they heard Mitchell scream "motherfucker!", but Mason admits that he does not know to whom the utterance was directed.  Id.  As to the second instance, for Mitchell to say "you can't drive this truck, motherfucker," without more, does not display any racial animus.  (Id. at p. 16).  Even if Mason were able to

26

demonstrate that Mitchell's use of the this term was based upon Mason's race or that of other African American employees, it is not severe enough to create a hostile work environment.  <u>Mitchell v. Pope</u>, 189 Fed. Appx. 911, 913-14 (11th Cir. 2006).  Also, Mitchell's alleged use of this term was too infrequent to give rise to a claim of harassment – as stated above, Mason testified that he only heard Mitchell use this term twice on the same day.  (Doc. 38-3, pp. 14-16).

    **(d)    Alleged $2 Million Insurance Policy**

    Mason asserts that Mitchell claims to have maintained a two million dollar insurance policy because he knew that one day, he would be caught calling African Americans "niggers" and "bastards."  (Doc. 1, p. 4).  Mason testified that two other MCS employees, Brad Dunn and Ray Norris, told him that they heard about the insurance policy from Mitchell after Mason left MCS and after he filed his EEOC claim.  (Doc. 38-3, p. 17).  However, Mason's testimony about what he heard secondhand is inadmissible hearsay, and cannot be used to defeat summary judgment. <u>See</u> <u>Alvarez v. Royal Atlantic Developers, Inc.</u>, 610 F.3d 1253, 1268 n. 10 (11th Cir. 2010) (<u>quoting</u> <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 n. 3 (11th Cir. 2002)).  Mason did not offer any affidavits or deposition testimony from Dunn or Norris regarding what they heard.

    Even if the court were to consider Brad Dunn's unsworn interview notes from the EEOC file, (Doc. 55-1, p. 2), this allegation would not be sufficient for Mason to survive summary judgment.  Mason admits that Mitchell's alleged statement came after he left MCS. (Doc. 38-3. p. 17).  Therefore, it was never directed at Mason, nor

spoken in his presence, and he cannot claim to have "subjectively perceived" this as harassment or racial animus.  See McCann, 526 F.3d at 1379.  Secondly, even if Mason had personally heard the statement directly out of Mitchell's mouth, this one incident does not establish that the alleged harassment was severe or pervasive enough to constitute a hostile work environment.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (finding that the " 'mere utterance of an ... epithet which engenders offensive feelings in a employee,' ... does not sufficiently affect the conditions of employment to implicate Title VII").

While Mason would likely argue that Mitchell's alleged statement indicates a pattern of referring to African Americans by racial epithets, hence the need for a supposed insurance policy, the court does not accord that much probative force to the EEOC file, limited as it is to one unsworn telephone interview, conducted without the opportunity for cross-examination of Mr. Dunn. See Young, 2011 WL 2555825 at *2, supra.  Furthermore, while Dunn may not have appeared for his scheduled deposition, Mason had sufficient time during discovery to pursue an alternative such as an affidavit or declaration from Dunn, in lieu of actual testimony.  Accordingly, the court finds that this allegation does not give rise to a prima facie hostile work environment claim.

**(e)   Alleged Martin Luther King, Jr. Comment**

Mason asserts in his Complaint that in approximately 2006, after having taken a day off of work in observance of Martin Luther King Day, Mitchell refused

to pay him for the holiday and told Mason, "they should have killed four more niggers, and you would have had the whole week off." (Doc. 1, p. 4).

However, Mason cites no evidence other than his utterly contradictory deposition testimony to support this allegation. (Doc. 50-2, pp. 12-15). Mason stated that, on the one hand, it was more likely than not that an African-American employee named "George" made the statement. Id. at pp. 12-13. Mason then backtracked under questioning and stated that Mitchell made the statement. (Id. at p. 14). This testimony is simply an insufficient basis upon which a reasonable jury could find that Mitchell made the alleged statement, and does not establish a hostile work environment.

**(f)     Allegation that Mitchell Stated He Did Not Want African Americans Working for Him**

Mason alleges that Mitchell stated he did not want African Americans working for him. (Doc. 1, p. 5). Mason also admits that he never heard Mitchell make this statement. (Doc. 50-3, p. 19). Instead, Mason claims that the alleged statement was related to him in a telephone conversation with Brad Dunn sometime after Mason's employment at MCS. Id. Even if the court were to set aside its concerns regarding the admissibility of Dunn's statement and accept that Mitchell said what is attributed to him, this statement in no way establishes a plausible claim that MCS was a workplace "permeated with discriminatory intimidation, ridicule, and insult." See Rojas v. Florida, 285 F.3d 1339, 1344 (11th Cir. 2002). Furthermore, since Mason admits that the statement was made after

his period of employment at MCS, he cannot claim to have subjectively perceived the alleged harassment.

Thus, for the reasons enumerated above, the court finds that MCS's summary judgment motion with regard to Mason's hostile work environment claim is due to be granted.

### 2. Racial Discrimination Claim – Title VII and §1981

### (i) Statement of the Law

Mason's claims are brought pursuant to Title VII and 42 U.S.C. §1981 and consist of disparate treatment claims alleging discriminatory pay and working conditions; a racial discrimination claim alleging wrongful termination based on racial animus; and a claim alleging a racially hostile work environment.  (See Doc. 1).  "Because the legal standards governing each of these categories of claims are the same, it is unnecessary to evaluate separately the Title VII … and the §1981 causes of action."  Pears v. Mobile County, 645 F.Supp.2d 1062, 1089 (S.D. Ala. 2009).

Title VII prohibits an employer from discriminating against a person based on race.  42 U.S.C. §2000e-2(a)(1).  Likewise, 42 U.S.C. §1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.  See, e.g., Johnson v. Railway Express Agency, 421 U.S. 454 (1975) (holding unequivocally that §1981 protects against racial discrimination in private employment).  Section 1981 liability must be founded on purposeful discrimination.  See General Building Contractors Association v.

Pennsylvania, 458 U.S. 375, 389 (1982);  Lincoln v. Board of Regents of the

University System of Georgia, 697 F.2d 928, 935 n. 6 (11th Cir. 1983).  Thus, a

showing of disparate impact through a neutral practice is insufficient to prove a

§1981 violation because proof of discriminatory intent is essential.  See id. at 388.

(recognizing that the drafters of §1981 were not concerned with practices that were

facially neutral).  Accordingly, only direct or circumstantial modes of proving

intentional discrimination are available to the §1981 plaintiff. See Larkin v.

Pullman-Standard Div., Pullman, Inc., 854 F.2d 1549, 1561 (11th Cir. 1988),

overruled on other grounds by Swint v. Pullman-Standard, Inc., 493 U.S. 929 (1989)

(where plaintiff proceeded on a theory of disparate impact, plaintiff is limited to

Title VII and cannot seek the broader §1981 remedies and longer liability period).

The test for intentional discrimination in suits under §1981 is the same as

that used in Title VII discriminatory treatment cases. Ferrill v. Parker Group, 168

F.3d 468 (11th Cir. 1999).  The plaintiff has the burden of establishing a prima facie

case of employment discrimination by a preponderance of the evidence. McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973).  This prima facie case can be

established in any one of three ways: (1) by presenting direct evidence of

discriminatory intent; (2) by presenting circumstantial evidence of discriminatory

intent through the McDonnell Douglas test; or (3) by demonstrating through

statistics a pattern of discrimination.  Earley v. Champion International Corp., 907

F.2d 1077, 1081 (11th Cir. 1990).

Where the plaintiff wishes to prove a claim of discrimination through circumstantial rather than direct evidence, the court evaluates the claims using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, the plaintiff must satisfy the initial burden under the statute by establishing a prima facie case of intentional discrimination. Smith v. Lockheed-Martin Corporation, 2011 WL 2567777, *2 (11th Cir. 2011). To do so, the plaintiff must show that (1) he is a member of a protected class (here, African-American); (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) his employer treated him less favorably than similarly situated individuals outside of his protected class. Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010). With respect to this last showing, "the individuals must be similarly situated in all relevant respects besides race, since different treatment of dissimilarly situated persons does not violate civil rights laws." Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1273-1274 (11th Cir. 2004) (internal citations and quotation omitted).

If the plaintiff is successful in proving a prima facie case, then a presumption of discrimination is raised and the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its employment action. Smith, 2011 WL 2567777 at *2. If the defendant meets this burden, then the presumption of discrimination is rebutted and disappears. Id. The inquiry then proceeds to a "new level of specificity," whereby the plaintiff must prove by a preponderance of evidence

that the defendant's reason is a mere pretext for unlawful discrimination. Id. at *3 (citations omitted).  "Thus, if a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination. Id. at *3 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-48 (2000)).

**(ii) Mason's Disparate Treatment Claim**

Mason claims that when business at MCS was slow and there was not enough work for all employees, he and other African American truck drivers were always the first employees to be sent home while white employees were allowed to continue working.  (Doc. 1, p. 5).  As evidence to support this claim, Mason cites his own deposition testimony, in which he states that on two occasions after he was sent home, he subsequently saw two white truck drivers driving MCS trucks on the highway later the same day.   (Doc. 38-3, p. 22).

MCS argues that Mason has offered no evidence that his being sent home on the days in question was related to his race, and points to the portion of Mason's deposition testimony, (Doc. 38-3, p. 23), in which he admits that he does not know why he was sent home, and admits that he cannot name any other African American truck drivers who were sent home on the days in question.  (Doc. 61, p. 12).  MCS also suggests that Mason's being sent home on two occasions when work was slow does not constitute an adverse employment action.  (Doc. 61, p. 11).

For employment actions to be "adverse," they must be "serious and tangible enough" to alter a plaintiff's "compensation, terms, conditions, or privileges of employment." Akins v. Fulton County, Ga., 420 F.3d 1293, 1303 (11th Cir. 2005). The Eleventh Circuit has declined to adopt a "bright-line test" for what kind of effect on the plaintiff's terms, conditions, and privileges of employment the alleged discrimination must have before it is actionable. Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001). However, the Eleventh Circuit has held that discriminatory alterations of financial benefits may qualify as adverse employment actions. Amos v. Tyson Foods, Inc., 153 Fed. Appx. 637, 645 (11th Cir. 2005) (citing Bass v. Board of County Commr's, 256 F.3d 1095, 1118 (11th Cir. 2001). If Mason was sent home on two occasions due to lack of work at MCS, then that action certainly altered his compensation to the extent that he was not paid for those days that he was sent home.[4] Therefore, the court finds that sending an employee home without pay on a slow day is an adverse employment action for Title VII purposes.

Furthermore, Mason is not required to show why he was sent home on slow days. It suffices that Mason has alleged and testified to the fact that he, an African American otherwise qualified to drive trucks for MCS, suffered an adverse employment action by being sent home on a slow work day, and that on two such occasions he saw two white truck drivers who had not been sent home. This

---

[4] Although Mason did not directly assert in his complaint or brief that he was not paid for the days he was sent home, it is reasonable for the court to infer as much in the non-moving party's favor. To be sent home on a slow work day with pay would confer a benefit upon Mason, something neither party has alleged.

testimony is sufficient for Mason to establish a <u>prima</u> <u>facie</u> claim of disparate treatment. Thus, in accordance with the <u>McDonnell Douglas</u> framework, the burden shifts to MCS to set forth legitimate and nondiscriminatory reasons for allowing white truck drivers to continue working during slow periods while sending Mason home.

The court is mindful of the Supreme Court's observation in <u>Reeves v.</u> <u>Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142 (2000), that the employer's burden "is one of production, not persuasion; it can involve no credibility assessment." (quotation omitted). Nevertheless, the employer must still proffer *some* reason, which MCS has failed to do here. Other than denying Mason's allegation in its amended Answer, (Doc. 18, p. 3), MCS makes no direct denial of this allegation and offers no reason or explanation at all as to why it sent Mason home and not other employees. Instead, MCS points out that Mason could not name other African American drivers or white drivers who were sent home on slow work days. (Doc. 61, p. 12). While it is understandable that MCS would point to weaknesses in Mason's testimony, it does not suffice as a stated reason for the challenged action, even by the low standard set by the Supreme Court in <u>Reeves</u>, <u>supra</u>. Accordingly, MCS's motion for summary judgment on this allegation is due to be denied.

Mason also alleges that African American employees were given the least desirable jobs at MCS, and that they were given the oldest, most deteriorated trucks to drive. (Doc. 1, p. 5). In its summary judgment brief, MCS argued that

these allegations to do not constitute adverse employment actions, and that therefore, Mason could not establish a prima facie case of discrimination with respect to these claims.  (Doc. 41-1, pp. 18-19).  Mason, in his Opposition to Summary Judgment (Doc. 47), neither addressed MCS's arguments, nor made any mention of these allegations.  Accordingly, the court deems Mason's failure an abandonment of these two claims.  See Crayton v. Valued Services of Alabama, LLC, 737 F.Supp.2d 1320, 1330-1331 (M.D. Ala. 2010)  (citing Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001);  Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325 (11th Cir. 2000); Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 182 F.3d 888, 892 (Fed. Cir. 1999) (affirming "the unremarkable position that assertions made in the pleadings (*e.g.*, complaint or answer) but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion for summary judgment.")).

**(iii) Mason's Discriminatory Pay Claim**

Mason claims that he was paid less than Caucasian employees performing the same or similar duties.  (Doc. 1, p. 5).  To establish a prima facie case of intentional discrimination in compensation, Mason must establish that: (i) he belongs to a racial minority; (ii) he received low wages; (iii) similarly situated white employees of MCS received higher compensation; and (iv) he was qualified to receive a higher wage.  See Cooper v. Southern Co., 390 F.3d 695, 735 (11th Cir.

2004) (overruled on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006)

(quotation omitted).

Mason's claim must fail as a matter of law because he does not support the claim with any evidence in the record whatsoever.  The court simply cannot find in Mason's Complaint or summary judgment briefs a single statement pertaining to allegations of discriminatory pay which cite to the record.  Mason's brief does not state what he was paid, nor assert what other employees were paid, nor cite to testimony in the record.

MCS, on the other hand, points to Mason's own deposition testimony, which contradicts his discriminatory pay claim.  (Doc. 38-3, pp. 6-7).  Mason stated that he did not know of any truck driver, or any other employee, making more money than he was.  Id.  Tellingly, Mason does not dispute or seek to clarify these statements.

Accordingly, the court finds that Mason has failed to state a prima facie case of discrimination in compensation because he has not established that similarly situated white truck drivers were paid more than he was.  Furthermore, given Mason's failure to cite to any fact in the record, the court finds Mason has failed to establish that he received low wages.

**(iv) Mason's Discriminatory Termination Claim**

Finally, Mason claims that his termination by MCS amounted to unlawful racial discrimination.  (Doc. 1, p. 8).  To state a prima facie case of discriminatory termination, a plaintiff must show that he (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was

treated less favorably than a similarly-situated individual outside of his protected class.  Walton-Horton v. Hyundai of Alabama, 402 Fed. Appx. 405, 408 (11th Cir. , 2010) (citing Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006)).

The parties agree that Mason is a member of a protected class and that he was a qualified truck driver.  However, they dispute whether Mason suffered an adverse employment action: Mason claims that he was fired (Doc. 1, p. 8), while MCS claims that he simply did not show up for work for a week and a half.  (Doc. 41-1, p. 21).  The disputed and undisputed facts surrounding the end of Mason's employment at MCS are recited supra.

In spite of the dispute over the adverse employment action, the court nevertheless finds that summary judgment is due to be granted regarding Mason's discriminatory termination claim.  Even if the court presumes that Mason was fired and did not simply abandon his job, Mason has not alleged that a similarly situated white employee called in sick and was subsequently fired.  Mason even admits as much in his brief opposing summary judgment.  (Doc. 47, p. 52).

While Mason's failure to establish a prima facie case is dispositive of his discriminatory termination claim, the court finds that even if Mason were able to point to a comparator, MCS has proffered a legitimate, nondiscriminatory reason for terminating Mason's employment for which Mason has not established pretext.

MCS's  burden  in this regard is "exceedingly light." Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (quotation omitted).  Thus, to comply with Title

VII, MCS "may fire an employee for a good reason, a bad reason, **a reason based on erroneous facts**, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/RahallCommc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984). [emphasis added]. Courts "are not in the business of adjudging whether employment decisions are prudent or fair," but rather, their "sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).

MCS has articulated that Mason's employment ended because he failed to return to work after being out sick for a week and a half and did not return phone calls from Wilkerson. (Doc. 41-1, p. 22). While Mason alleges that he spoke with Wilkerson and had permission to take additional sick time, (Doc. 50-3, p. 44), MCS nevertheless alleges that Mitchell and Wilkerson, Mason's supervisors, expected Mason to return and made several phone calls trying to contact him. (Doc. 38-4, p. 7). For this reason, MCS viewed Mason's actions in November 2008 as job abandonment, and it is irrelevant whether Mason believed he had permission to stay home from work, so long as MCS's reason for termination was not discriminatory. See Louimard Louissaint v. Westminster Community Care Services, Inc., 2006 LEXIS 81266 (M.D. Fla. Nov. 7, 2006). Thus, MCS has met its burden of demonstrating a legitimate, nondiscriminatory reason for terminating Mason.

Thus, the presumption of discrimination is rebutted, and therefore disappears. <u>Smith v. Lockheed-Martin Corporation</u>, 2011 WL 2567777, *2 (11th Cir. 2011). The inquiry now proceeds to a "new level of specificity," whereby the plaintiff must prove by a preponderance of evidence that the defendant's reason is a mere pretext for unlawful discrimination . <u>Id.</u> at *3. (citations omitted).

A plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." <u>Ritchie v. Industrial Steel, Inc.</u>, 2011 WL 1899570, *5 (11th Cir. 2011) (<u>citing</u> <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997). Rather than "simply quarreling with the wisdom of [the employer's] reason," the plaintiff "must meet that reason head on and rebut it." <u>Id.</u> (<u>quoting</u> <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000)). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs." <u>Alvarez v. Royal Atlantic Developers, Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010).

Mason readily admits that he cannot discredit MCS's nondiscriminatory reason for terminating his employment.[5]  (Doc. 47, p. 52). Nevertheless, Mason

---

[5] Mason seeks to blame MCS for his inability to demonstrate pretext, arguing that "Defendant's brief argues only that Plaintiff was never terminated for any reason. Defendant cannot dispose of Plaintiff's case by arguing an alternative theory in the event the Court determines…a question of fact relating to his termination claim. Because of Defendant's own argument, Plaintiff cannot point to a similarly situated employee or discredit the reason…" (Doc. 47, p. 52). Mason cites no authority and provides no further explanation for why the court should penalize MCS for both arguing its version of the facts and also arguing that, in any event, (Continued)

points to his hostile work environment claim as evidence that MCS, and Mitchell specifically, held racist views and allowed an environment of racial animus to permeate the workplace, amounting to circumstantial evidence that MCS's proffered reason is pretextual.  Id. at 53.  Mason also cites Eleventh Circuit authority for the proposition that "language…showing some racial animus may be significant evidence of pretext."  Damon v. Fleming Supermarkets of Fla., 196 F.3d 1354, 1362 (11th Cir. 1999).  Mason also points to Ross v. Rhodes Furniture, 146 F.3d 1286, 1291 (11th Cir. 1998) to support the assertion that even one single racial comment can constitute circumstantial evidence of discrimination and therefore could persuade a jury to disbelieve the Defendant's proffered reason.

The court will not repeat here its analysis of Mason's hostile work environment claim, supra, except to note that Mason's evidence was not sufficient to establish a prima facie case.  Furthermore, this case is distinguishable from both Damon and Ross.  In Damon, the court held that language showing racial animus may be significant evidence of pretext, *once the plaintiff has set out a prima facie case*, which Mason has failed to do.  Damon, 196 F.3d at 1362.

In Ross, the plaintiff succeeded in establishing a prima facie case of discriminatory termination, unlike Mason.  Id. at 1290.  Furthermore, the Ross

---

it had no unlawful discriminatory reason for terminating Mason's employment after he had been out sick for more than a week.  To penalize MCS in this way would require the court to ignore MCS's "exceedingly light"  burden under the legal framework established in McDonnell Douglas.  It would also relieve Mason of his more substantial legal burden of proving pretext by a preponderance of the evidence.  The court declines Mason's invitation.

plaintiff offered the "single racial statement" at issue as additional evidence, over and above the evidence he had offered to establish his prima facie case. Id. at 1291. And the single racial comment did not, by itself, prove pretext. Id. Rather, the court viewed a supervisor's offensive racial remark in conjunction with the record evidence, including the fact that another supervisor had been caught receiving tips, which was the very pretextual offense that the defendant cited when he fired the plaintiff. Id. at 1292.

Here, Mason claims that he has presented "a plethora" of evidence relating to his hostile work environment claim which could persuade a jury to disbelieve MCS's proffered reason for terminating him. (Doc. 47, p. 53). The court disagrees, because Mason's evidence, as discussed supra, consists primarily of (i) testimony from Mason that is contradicted on the record either by Mason himself or by other MCS employees; and (ii) unsworn interview notes from Brad Dunn, an unavailable witness who has not been cross-examined. Thus, while it is understandable that Mason would seek to draw comparisons between himself and the plaintiffs in Damon and Ross, his evidentiary showing is not comparable.

**(v) Mason's Lockheed Argument**

Finally, Mason cites the Eleventh Circuit's recent opinion in Smith v. Lockheed-Martin Corp., 2011 WL 2567777 (11th Cir. June 30, 2011) for the proposition that "[e]stablishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case." Id. at *4. "A

42

triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.' " Id. (quoting Silverman v. Board of Education, 637 F.3d 729, 733 (7th Cir. 2011)).

Mason asserts that Lockheed provides a sufficient basis upon which to deny summary judgment in the instant case. (Doc. 58, p. 2).  He is mistaken.  The Eleventh Circuit decided that the Lockheed plaintiff could survive summary judgment despite the fact that he could not point to a comparator, because the plaintiff produced a significant evidentiary record (the "convincing mosaic") that Lockheed-Martin had considered the plaintiff's race in their decision to terminate him.  This evidence included a (i) spreadsheet which listed employees by name and race; (ii) a documented history of inconsistent treatment of white and African-American employees; and (iii) a television news expose covering racial tension and workplace violence at Lockheed-Martin.

As discussed in detail above, the circumstantial evidence that Mason has provided falls short in comparison to the significant record provided by the Lockheed plaintiff, and certainly does not form a "convincing mosaic."  Mason has offered the court nothing with which to set aside or look beyond the McDonnell Douglas framework, and cannot survive summary judgment on the issues of a hostile work environment, discriminatory pay, and discriminatory termination.  Obviously, this analysis does not apply to Mason's disparate treatment claim, supra, regarding which the court has denied MCS's summary judgment motion.

## V. CONCLUSION

Upon a thorough analysis of all matters presented, the court concludes that MCS's motion for summary judgment (Doc. 37) is due to be **GRANTED** as to Mason's hostile work environment, discriminatory pay, and discriminatory termination claims, as well as Mason's disparate treatment claims pertaining to his allegations that African Americans were given the least desirable jobs and most deteriorated trucks to drive.

The court also concludes that MCS's motion for summary judgment is due to be **DENIED** with regard to Mason's disparate treatment claim regarding African American employees being the first sent home on slow days.

Furthermore, the court concludes that Mason is **ESTOPPED** from pursuing money damages as to any of his claims.

**DONE** and **ORDERED** this 12th day of September, 2011.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE